Case number 19-3540, United States of America v. Angel Cordero v. Edward Rios-Baliquez. Argument not to exceed 10 minutes for each defendant and 20 minutes for plaintiff. Mr. Pagano, you may proceed for the appellants. Thank you. Good morning, Your Honor. May it please the Court, Joseph Pagano on behalf of Mr. Appellant, Mr. Angel Cordero. As was previously coordinated, I'll be reserving two minutes for rebuttal. As this Court is aware, this is a factually complex case, approximately a 3,000-page transcript. I'm going to try to give a brief factual synopsis of what occurred here or what is alleged to have occurred. My client, Mr. Cordero, was serving a 40-year prison sentence out of the Southern District of New York when he was charged in this two-count indictment alleging conspiracy to commit murder for hire and conspiracy to possess with intent to distribute and to distribute cocaine. Prior to trial, the government filed motion eliminating to admit other acts evidence, which was granted by the Honorable Judge Benita Pearson. After trial, or at the end of trial, Mr. Cordero was convicted of both counts and subsequently sentenced to 120 months on count one, 300 months on count two. Those were to be served concurrently but consecutive to the... Mr. Pagano, I would encourage you to sort of just get right to your argument. You can assume we know all these basics about the case. Yes, sir, Your Honor. Thank you. And I raised four assignments of error, first being a sufficiency as to the murder for hire count, the second being sufficiency as to the conspiracy to distribute, the third that the court erroneously or improperly admitted the other acts evidence, and the fourth that the sentence was procedurally unreasonable. At trial, the government's two main witnesses were jailhouse informants, both looking for early release in exchange for their testimony. They admitted to looking to obtain knowledge of wrongdoing to get out of jail quicker. The state used that testimony as well as the other acts evidence to obtain convictions. I would say my first assignment of error is that the government failed to prove through sufficient evidence that my client acted with the intent to commit the charge of conspiracy to commit murder. I would say that relying on the Barnett case, which said that to connect the defendant to a conspiracy, the prosecution must demonstrate that the defendant agreed with others to join the conspiracy and to participate in the achievement of the illegal objection. In this case, it is clear through the testimony that my client had no idea what the intention of the end user was with the location of... Well, didn't Mr. Valasquez say that his intention was to quote, bury the bitch in the backyard right now? Didn't he say that to your client? Your Honor, I don't recall that. I do not recall that. I recall my client... Valasquez did say that to your client, that a jury could conclude that your client knew that his intention was to kill Goines? I don't know that that's necessarily correct because I think that at the end of the day, there was nothing done in furtherance of that. I think that, you know... If we're just talking about intention for the moment, why wouldn't that show an intention to kill this woman? I would say that my client never showed any intention to act in that way. From his perspective, all he was doing was providing a telephone... He was providing or helping to provide an address of Ms. Goines. To someone who said that they basically wanted to kill her. So that's kind of the way conspiracy works. You know, you have an agreement to a common plan and it would seem like he's acting pursuant to it, knowing what Valasquez's intention is. I mean, I'm struggling to see how a jury could not reach that conclusion. I would just... As to the discount, I would just, you know, rely on my brief where I indicate multiple times over and over that my client wasn't... He did not know specifically that that was what was going to happen. I think on multiple occasions, he indicates that he doesn't know what they're going to do. And I would stick to that as my response. All right. Thank you. As for the conspiracy to distribute the cocaine, there's... In connecting my client to that package, he can't be shown to have even known what was in that package specifically. So from our opinion, that count must fail, as must the sentence. Also, and then quickly getting into the other acts evidence, it's clear that the government used the other acts evidence to buttress their case, specifically with regard to the conspiracy to distribute the cocaine. When they introduced the evidence that my client was engaged with the co-defendant in distributing the K2, it would have been easy for the jury to segue. He was doing this. They must have been doing that. When there's no evidence that my client knew what was in that package or actively took part in rerouting that package. Okay. If there are no further questions, that's all I've got right now. Thank you. Thank you. Hear from Mr. Kudochieff. Sir, you have to turn on your volume. Mr. Kudochieff, you're mute. Thank you. All right. I think I'm good to go now. There you go. We can hear you. Thank you. Good afternoon. May it please the court. Judge Rogers, Judge Ketledge, and Judge Nell Bandyan. I am Richard Kudochieff. I am CJA counsel. I'm honored to be a member of the panel and under the plan of this court. And I am privileged today to present argument in this distinguished panel and in the sixth circuit. I am appellate counsel for Eduardo Rios Velasquez. Your Honor, Judge Ketledge, I will be answering your question and demonstrate to you that the record does not reflect that my client said the words that you had uttered. This case gives the court an opportunity to clarify and refine murder for hire and what it takes for consideration to provide proof beyond a reasonable doubt and also to clarify conspiracy between two jailbirds and an outsider. So it's an opportunity for this court to clarify and refine. How does this interpretation testimony of this jailbird, Mark King, turn into proof beyond a reasonable doubt? Where is there agreement in this group in this case? And really, how can King give interpretation so freely without objection, without proof of someone who wants to hire a killer? So I have time for three main points. The government has failed to prove conspiracy, either for murder for hire or for drugs. Two, there's no promise to pay for murder. There's no money exchange. There's no consideration. And this translates into there's no intent at all. There's no agreements among Cordero and Velasquez. I got to tell you, while outlining this merit brief, I was actually sitting on the upper peninsula of Michigan overlooking the Mackinac Bridge in a campground called the Strait State Park. On the Straits of Mackinac, separating Lake Michigan and Lake Huron, two of the greatest lakes in the world, maybe Lake Superior is the best. But I'm from Muskegon, and I've had many contemplations of life on the beaches of Lake Michigan. These lakes provide much inspiration and thought, word, and deed. I was inspired on this case. This is a Great Lake case. This is from Lorain, Ohio, on Lake Erie. And I was thinking of Mark King, Your Honors. When you make $1.2 million in five years as a fraudster, you've got to be good. He's a liar, a ripoff artist. He's a thief, an identity stealer, and an identity creator, and that's what's so significant. He creates false identity. Mark King creates false reality. And something occurred to me that he said. When they were talking, when Mark was wired and he was trying to get Angel to supposedly talk about this murder plot, and he wanted to get talk on recording, well, Angel said, Eduardo was going to, quote, sell Tyra's location. And Mark questioned this. He goes, sells it for what? I thought he was going to do the head. And Mark exclaimed, it didn't make sense. It doesn't make sense. And that's the government's theory, Your Honors. It doesn't make sense. They did a great job at trial. I wasn't there, by the way, in portraying, you know, in the portrait they painted here. But they left some blurry spots in the portrait. And that's why there was error in the courts below who did not grant the Rule 29 motion. Tyra Goines, here you have a 37-year-old woman, home health aide, mental illness, no record. She was pretty straight in her uncontroverted testimony. And she debunked, you know, there was supposedly this thing where she set up this robbery for drugs and money, and then Glenn got killed. Glenn, the friend, the drug dealer of Leon. There's no proof of that whatsoever. That was another false reality created by this fraudster who knew exactly what he did. What Tyra said, Leon and her are good friends, very positive. So the government's theory for murder is just not making it. There's no proof. Well, I mean, Mr. Coonerty, why don't you couch this in terms of which element you think they failed to prove and why? First of all, they failed to prove even that there was a scheme to murder for a hire at number one. Because Tyra debunked that theory of itself. Where does that theory come from? It comes from we don't know. So the government doesn't prove that component. And then Tyra debunks it in its entirety. Here, let's talk about, well, she gets off the grid. You can't find Tyra. That's preposterous. Here, Mark King calls from a cell phone in prison and finds her address in two minutes. But, I mean, the jury was entitled to believe King if they so chose. Isn't that correct? I think so. But that's where we get with the issue of whether there's sufficient evidence. Because, Your Honor, the jury lost its way in this case. Yes, they could have believed Mark King. If you take a transcript, Mark King is giving his impressions of this, of that. So he knows what he's doing. And I'll tell you one other thing. When you get to conspiracy, the government couldn't charge my client with an individual case. There was no possession. So they couldn't charge him with murder for hire. There was no proof of that. So what do they do? They come up with this conspiracy theory. And not to mention, the prior acts in this case, Your Honors, I mean, this is a case to sever. The fact that it wasn't moved for severance below is clearly plain error. But notwithstanding that, there should have been no proof or allowance of prior acts relative to the Rosario supposed plot. That's a different issue now that you're arguing. Is that right? It is, Your Honor. And it goes to a number of things. It goes not only to the weight of the evidence, but it surely goes to the fact that it was so prejudicial to my client, Eduardo, to allow this Rosario conference between him and an angel. So they charge conspiracy. They lump Eduardo into this group of people. But there's insufficient proof of connection there. So, again, here we have King creating a false impression. And when it comes to rerouting this package, which, you know, the United States Postal Service does not do rerouting, couldn't be done. And then King wants $15,000 to reroute it. It just doesn't make up any sense. So the circumstantial evidence claim of the government, there's just not enough there. And that's how the jury loses its weight. They did a great job of presentation. Mark King came up with, well, this is what I think he said. This is what I think was said. No, how can that be? So let's talk about, oh, and also you have angels saying, well, there's three kilograms in this package. There wasn't three. There was one kilogram in that box. Now, the last thing I want to say at this juncture is that to hire someone for murder, you need someone who is hiring. There is no proof, none, that anyone had a promise to pay money. That was what was in the indictment as consideration. There's no evidence, none, that anyone had a promise to pay Eduardo money for murdering someone. There's just insufficient proof of the crimes in this case. And my brief deals with it very extensively. I think in conclusion of my initial presentation is if you take a look at this complicated factual that comes from Mark King. Mark King did this well. He designed it well. And that's why he made $1.2 million as a thrivester, creating false reality. And I'm going to ask you, Your Honors, to reverse the conviction of my client. All right. Thank you, Mr. Cuda Chief. I agree with you about the Great Lakes for what that's worth. Well, thank you, Your Honor. All right. We'll hear from Mr. Ranke. And I would specifically ask, Mr. Ranke, on what page of the transcript would you say there's proof that there was some payment going to be made for the murder? I mean, when you get to that. I'm just flagging that as something that we'd like to hear about. Well, I would discuss payment early on. Actually, Velasquez actually discussed payment with King on a phone call on June 29th or 30th. When this all came about, and I'm not going to go into the credit card fraud scheme that happened before because the court's familiar with that. But once Cordero learned that Mark King was adept at cell phone use and getting people's identity, he asked to find Tyra Goines. And on one of these calls before the tape conversation on July 7th, Velasquez discussed payment with King to try and get this information. There was also... Do you know where in the record, I mean, the page ID perhaps from the trial, just to nail this down? I mean, if you don't have it handy or don't know, we can dig it up. But I would clarify the issue. I believe, Your Honor, I'm sorry it's taking me a minute. I believe it was right around page ID 1200 to 1205. Okay, thank you. And some of that also, I'm sorry, actually some of that involved King getting Velasquez's equipment for his landscaping business fraudulently through Home Depot and also refrigerators and things for Velasquez's family. The payment actually was closer to page 1221 to 1224. Okay, thank you. And Velasquez, there was other evidence beyond just King's testimony that showed that Velasquez was involved in this conspiracy. They discussed payment. Velasquez told King that if this information was correct, he would be paid. Velasquez asked King to reroute a package, a spyware package, that he was going to use to stake out Tyra Goyen's apartment to facilitate the murder. Could I ask just sort of an overall question? Who wanted her killed and why? Initially, they were told that Victor from California wanted Tyra Goyen's killed because he believed that a home invasion robbery happened at one of his properties where the victim was supposed to just be tased and they were supposed to take the drugs and the money. What happened, unfortunately, was the victim was killed and they believed that Tyra Goyen took the money and the drugs and quote-unquote went off the grid, which is why they couldn't find her. They is who? Velasquez and Cordero. More Velasquez because Velasquez apparently knew the person who was killed. So Velasquez wanted her dead? Is that what you're saying? No, Velasquez knew that. Who wanted her dead? That's what I'm asking. Who wanted her dead? That person was Leon Stone, Your Honor. Leon Stone. They said Victor from California when they were dealing with King and actually King talked to who he thought was Victor from California. We look at the evidence. Stone actually owned a house where the home invasion robbery occurred. Velasquez was texting Stone once he got the address from King with the address on the corresponding text, happy birthday, even though it wasn't Leon's birthday. Leon's picture was in Velasquez's phone so the jury could make the logical inference that Victor from California was actually Leon Stone. So Leon Stone wanted to kill Ms. Goyen and hired Velasquez to do it and Velasquez got Cordero to help him. Is that the theory? It is because Cordero knew King. Velasquez became aware that King was adept at finding people on the internet and doing things on the internet. So they believed that they could use King as a tool to find Goyen because they hadn't been able to find Goyen. And it wasn't that easy to find Goyen either. She was in the white pages, but I believe the evidence showed that it really wasn't a correct address. She was also on Facebook, but you really couldn't find her through that. How King actually found her was, and this is something he did often, he pulled up her credit report, which was something he was adept at. Was that evidence given to the jury? It was. What you just described? It was. There was some suggestion at one point that there was going to be $20,000 paid, as I recall. So that money was going to come from Leon Stone? Was that the theory? That was the theory, your honor, yes. It would go to Velasquez? Okay. The fact that that money wasn't paid doesn't really affect the actual murder for hire or the elements for murder for hire. And again, you had Velasquez. Now, the argument, particularly Mr. Velasquez argues, really his argument is an attack on the credibility of King. They attacked King's credibility in court at trial, the jury heard that, and they chose to believe King. And there were other things Velasquez did, which corresponded with King's testimony. Velasquez actually pointed out when King first, on July 7th, during the recorded conversation, Velasquez asked for and received Coyne's address, but King sent only a partial address because he was told not to send the address at all. Velasquez realized that that was an incorrect address, sent back that he couldn't find it in his GPS, and then King panicked and sent back her actual address, which Velasquez then verified was correct, at least in his GPS. He then went out to her house and took a picture of her car, and then he was arrested after he'd been to her apartment. So it's not all just King's testimony, or King's testimony, there's Velasquez's actions here, and then it's combined with King's testimony and things that Cordero and King discussed about Velasquez and the murder for hire plot. Things like, initially right off, they told King that Velasquez wanted to kill Coyne, and that was at page 1222, page ID 1222 of the trial transcript. King didn't really believe that initially, but then as it went on, Velasquez stated that he was going to tie her up and get rid of the bitch, which that was at page 1223 and page 1230 of the trial transcript. They discussed how much money was going to be paid, and Cordero responded, it depends on how he's going to do this. Is he going to bury the bitch in the backyard? I don't know. That was at page ID 1499 of the trial transcript. And then you go back to the spyware package, the reroute of the spyware package, which was at page 1263 and 1264 of the trial transcript. I'd like to go to, if the court doesn't have any further questions on the sufficiency, I'd like to go to the 404B Other Act, the admission of 404B Other Act evidence. Sure. There were two pieces of evidence involved here, as the court knows. Cordero's request that Miguel Rosario kill the hacker and the sale of synthetic marijuana in prison. And one thing that's also interesting is Rosario's testimony. Rosario didn't know King. He never met King. He didn't even know King's name. Rosario's testimony of his conversation with Cordero after Cordero was mistakenly released from solitary confinement because they believed he was another Angel Cordero, matches up with King's testimony pretty closely, which I think the jury found at least led in credibility to some credibility, more credibility to King. When he found out, when Cordero was released from solitary, he met Rosario, who he had known for a long time. He'd been in a cellmate with him. He'd known him for years, I think about 10 years, and he wanted Rosario to get him a phone. Rosario did get him, rented him a phone, and then Cordero tried to call Velazquez, who he couldn't reach. He started getting nervous, already believing that he had been kind of exposed by someone, that he had a legal cell phone, which is why he was initially put in solitary. Then he called Velazquez's girlfriend. Velazquez's girlfriend then told him that Velazquez had been arrested for murder for hire, that Cordero was going to be, and that they were telling Velazquez that Cordero had made a statement. Counselor, can I ask you a question? So is the theory, is this just, this is just a theory that a threat, it's a threat against a trial witness or against a witness that shows that you're conscious of guilt of the underlying crime, is that right? That was one of the things that the trial court relied on when it let it in, Your Honor. They said it was highly probative of consciousness of guilt in connection with the murder for hire, as well as the drug conspiracy. It also showed that he was willing to have King murdered to ensure that he didn't cooperate. And that's something that we've allowed, our cases are clear on that point, I think, is that right? I believe so, Your Honor. Let me ask you about the K2 issue, though. I don't understand how that, how is that related to the cocaine or whatever? It just seems like it's in prison, it's a different situation. Is it just to show a general, you know, intent to distribute drugs, is that it? Yes, Your Honor. Actually, that's that, that was, I think, the main purpose, because it was in prison. It also tried to show, helped to show a relationship between Velazquez and Cordero, an ongoing relationship. Cordero had told Rosario that Velazquez had taken care of him since he was released. Velazquez, I think, had been released about a year, maybe a year and a half before this happened. And that they were still in close contact and that Velazquez was trying to take care of Cordero by either getting him money or synthetic marijuana to sell in prison. Mr. Ranke, if I may, how is proof of intent here different from a forbidden inference about propensity? I'm sorry, Your Honor. Could you say that again? Yeah, I mean, I mean, correct me if I'm wrong, but 404B does not allow the admission of evidence for the purpose of allowing a jury to infer that, you know, once a drug dealer, always a drug dealer. He sold drugs back then, therefore, he probably did it here too. Right. I mean, but you can't, but there are, so propensity, a propensity to commit a certain crime is not a legitimate basis to admit evidence that the defendant committed the same crime in the past. Right? Isn't that accurate? Okay. But you are allowed to show, to admit evidence like this to show that the defendant had the requisite intent in this particular case. Right. And that's what you're saying the government did here. Right. But, but I mean, how is it different? How are you not proving intent by propensity, I guess? How is this not a propensity usage veiled as an intent, evidence of intent? I think it's, it was Velasquez and Cordero both claim they had no knowledge of there was cocaine in that package that would be rerouted. Their, their position was somehow they just wanted to reroute a package with King's assistant. And I think it could show their knowledge by the fact that they were involved in other, and it wasn't cocaine and it was in prison. You're right. It was synthetic K2. It was a totally different drug. It's a different situation, but it does show their knowledge that it does help to show that their knowledge that the package that they were trying to reroute actually contained narcotics. Mm hmm. So go ahead, go ahead. What about knowledge or intent to participate in the conspire in a conspiracy? Are they, the drug is the drug charges, a conspiracy charge too, isn't it? It is. So is there, is there intent? Can you use it to show intent to participate or in a conspiracy or, or knowledge of a conspiracy? I think you can show it to show knowledge of the conspiracy. Because they were, their, their whole point was that there was no drugs and they weren't going to do this. And the evidence showed the opposite, really, that they knew that there were some of the statements that Velasquez made directly to King. And that while he didn't say it was cocaine, you know, he said, stop, we would be rich if we could reroute it. And that, and that he had a reputation as a, as a drug dealer anyway. And that's why King, you know, believed that there were cocaine in the package. And there was cocaine in the package. Ultimately, when the package was opened in Puerto Rico, they found a kilogram of cocaine. Council, I see your time is out. And I have a brief end of the briefs kind of question that I'd like to ask with my colleagues forbearance. They Velasquez brief at the very end says that the court that sentencing guideline 2x 1.1 should apply. And I guess that deals with inchoate crimes. And I don't see any response to that in your brief. Is that is that just something that's not worthy of a response? Or did I miss it? Or am I making sense? I'm sorry, I mean, interrupt. I think we didn't go there because we confessed the error that that he was that Velasquez shouldn't have been a career offender, because of murder for hire doesn't qualify as a crime of violence, given the current case law, and that conspiracy didn't qualify as a controlled substance offense. How did 2x apply to that? I don't think it did really. I just think since we conceded error that we thought it was going back for resentencing. And so that's where we stopped. So so you just want to put that issue back down to the to the trial court? Is that the idea? Or is it preclude is is our except assuming we accept your, your confession of error. This is that moots out the 2x problem, or we're just funding it down to the other court to the district court. I'm trying to see what what we will go back to court to make a decision as to whether that should apply. Okay, thank you. Thank you. Okay, no further questions. Thank you, Mr Anki. We will hear rebuttal. Thank you, Your Honor. Just briefly, I want to touch on the issue of the prior bad acts and the propensity of the information about selling the cane to in the institution. For me, the evidence of this conspiracy to distribute is so weak that I don't believe without this prior bad act information, which the jury could easily say that they're acting in conformity with this prior bad acts. So they must have known or must have been just trying to distribute this cocaine is far too great. It's judicial to have been let in. And I believe the jury lost their way and came to their conclusion based on this for for evidence. Thank you. I would ask the court to reverse the convictions. Thank you. Thank you. Lori, is there any more rebuttal? Okay, if I may, and I'd like to direct to answer your question, Judge Ketledge. The transcript at 1223. Here's what it says. So Cordero is talking to Mark and saying to Mark, don't say anything to Velasquez because I'm not supposed to be here. And so this is what the transcript says. And he asked Cordero. So he asked, I'm going to assume it's Eduardo asked Cordero, if you find her, what are you going to do? And he it was Cordero who said, I'm going to tie her up and get rid of the transcript says it's Cordero saying that not my client. Does that matter since it's a conspiracy charge? And you know, in terms of joint responsibility? Absolutely. I mean, that's the whole point of this matter. I mean, there's no connection. They can't these two jailbirds can't connect. There's no connect. It's a disconnect. But the government can't respond to my arguments. The propensity issue on 404 B is exactly what I'm talking about. Tyra debunked the whole theory. Who cares about the emojis in the first place? And there's no evidence that my client knew what was in the box. Most specifically, the government have never shown that there is a promise to pay money, an agreement to pay money from anyone. There's no proof of intent that goes along with that. And there is no the government has not shown that Eduardo and Victor ever got into a contract or there's any consideration. Your Honor, so you have a great opportunity to deal with SCR and I'll talk about pecuniary value. There's no quid pro quo here. You can affirm a serial and clear clarify a serial. There's simply insufficient evidence in this case. The jury lost its way. The court should have granted 29. I'm asking that the conviction of Eduardo Dario Celeste goes the reverse. I'm going to cut my beard off. I know I look like a mountain man. So, you know, don't worry. That's it seems to be in fashion at the moment. So that's acceptable. Thank you for the time given to my client. I appreciate the opportunity to be here today. Well, we appreciate your argument as well as Mr. Pajano's and Mr. Ranky's. And we particularly want to thank defense counsel. I believe you're both appointed pursuant to the Criminal Justice Act. If I'm I don't have that usual sheet in front of me for some reason. But but I want to thank you both for your service in this case and contribution to our work in the justice system. So thank you both. And the case will be submitted. The clerk may call the next case. Thank you very much, Your Honor. Best wishes to all under these times. Thank you.